[Civ. No. 55437. Second Dist., Div. Three. Feb. 29, 1980.]

In re the Marriage of PAULA R. and BARRY L. LEVIN.
BARRY L. LEVIN, Respondent, v.
PAULA R. LEVIN, Appellant.

COUNSEL

Flax & Rosenfield, Richard L. Rosenfield and Avery H. Einhorn for Appellant.

Mary-Lynne Fisher, Fred Okrand, Steven Morgan, James Donald and William F. Soo Hoo as Amici Curiae on behalf of Appellant.

Harvey W. Gazin for Respondent.

OPINION

**COBEY, Acting P. J.**—The mother, Paula R. Levin (Paula), appeals from that portion of an interlocutory judgment of dissolution of marriage awarding custody of the only child of the parties (Mona Beth, born May 12, 1975) to the father, Barry L. Levin (Barry). The appeal lies. (Code Civ. Proc., § 904.1, subd. (j).)

We propose to reverse this permanent child custody award because the trial court, in making it, failed to anticipate the change in California child custody law that our Supreme Court made subsequently in *In re Marriage of Carney* (1979) 24 Cal.3d 725 [157 Cal.Rptr. 383, 598 P.2d 36], in the situation where one parent is handicapped. We will direct, however, that Mona remain in the custody of her father pending a new custody hearing because she has largely been in his custody for all but approximately nine months of her life and he has been, by and large, apparently an excellent custodial parent.[1] We will suggest, though, to both parents that at the new custody hearing, either or both should apply for joint custody of Mona since that type of custody has quite recently been declared by the Legislature to be the preferred child custody situation[2] and might be particularly appropriate in this case.

---

[1]The only complaint regarding Barry's performance as a father has been that he sent Mona to nursery school at the minimum age of two years for four and one-half days a week, six to seven hours a day to give her substantial contact with her peers and to provide him with uninterrupted working time, since he works at home.

[2]Civil Code section 4600, since the first of this year, has provided: "that it is the public policy of this state to assure minor children of frequent and continuing contact with both parents after the parents have separated or dissolved their marriage, and to encourage parents to share the rights and responsibilities of child rearing in order to effect this policy."

## FACTS

Mona Beth Levin, the subject of this appeal, was born to Paula and Barry Levin on May 12, 1975. Paula, the previous December when four and one-half months pregnant, had suffered an intercerebral hemorrhage (stroke) and as a result thereof was hospitalized in three different hospitals and one convalescent home in New York City and Los Angeles from December 1974 to June 1976.

Barry took care of Mona during the approximately 13 months of Paula's hospitalization that followed Mona's birth.[3] In New York City he was assisted by a homemaker who was with Mona five days a week, Monday through Friday, 9 a.m. to 5 p.m. and in Los Angeles, a month after their arrival in January 1976, he had similar assistance for six days a week from a trained professional attendant who was there, however, primarily to assist Paula. He also used in Los Angeles a professional baby-sitter two or three afternoons a week and occasionally on weekends.[4] After Paula joined the household of Barry and Mona in June 1976, Barry had the help of the attendant but Paula insisted that Barry generally take care of her personal needs.

On or about March 8, 1977, Barry, with Mona, moved to another apartment and Paula then moved in with her aforementioned mother, Mrs. Singer. Shortly thereafter Barry's parents moved in with him and Mona. Mona has her own separate bedroom in this apartment which has two bathrooms. As already mentioned Barry also uses a professional baby-sitter in order to have some uninterrupted working time. Also, as we have already noted, as soon as Mona reached the age of two years in May 1977, Barry enrolled her in a nursery school which she attends six to seven hours a day, four and one-half days a week.[5] Apparently Barry has had a very warm and loving relationship with Mona. During the extensive period when he has been the only parent in the household, he has been an excellent mother as well as a father to her. He has been teaching her to play the piano and they often listen at home together to classical music. He also paints with her. Mona appears to be a very happy child with a strong attachment to her father.

[3]Mona was at St. Vincent's Hospital for 10 days after her birth and the first week after she came home with Barry, Paula's mother, Mrs. Singer, helped to care for Mona.

[4]Paula's mother would fill in for the home attendant on Sundays.

[5]This average daily attendance is caused by the fact she goes only every other Monday.

Barry makes a comparatively modest living at home as a free lance manuscript editor and promotional writer. He earned about three years of college credits.

Paula, a very bright young woman, and a former preschool and elementary school teacher in Spain and Chicago, has a B.A. in education and a graduate language and cultural certificate from the University of Madrid. She speaks four to five languages. At the time of the custody hearing under review, namely February 1978, she was generally confined to a wheelchair but she could walk a few hundred feet by herself. She needs assistance, however, in turning and in getting up from her wheelchair. She has permanently lost much of her vision in her right eye and is unable to see things to her left without turning her head. The prognosis though then was that she would eventually be able to walk with a cane.[6] These physical limitations mean that she will need assistance for some time both for herself and in caring for Mona. She can prepare Mona's meals, however, and feed her. She can also dress Mona with some difficulty. She does need assistance in bathing Mona but she can and does play with her in a great variety of ways and makes a point of teaching her in the course of this play. She also paints with Mona. Their relationship is a very warm and loving one. Mona has no aversion to her mother's wheelchair. Mona also has a close and loving relationship with her Grandmother Singer and with her mother's home attendant as well. Mona enjoys the well equipped play area and pool next to the apartment building where her mother lives and she plays there in safety with her peers. Mona is already bilingual. She converses with her mother in English and with her mother's attendant in Spanish.

The expert opinion in this case was numerically heavily in favor of Paula. The physician in charge of Paula's rehabilitation told the court's child custody investigator that Mona would be better off with her mother. A husband and wife team of psychologists reported observing a very warm and natural relationship between Paula and Mona and both opined that a child of Mona's age should generally be with her parents rather than in a nursery school and that Mona's hours in attendance there were too long in any event. The psychiatrist on Paula's rehabilitation team was of the view that generally the mother-child relationship was crucial for a child during its first three and perhaps four years of life and that taking Mona from Paula would deprive Paula of "the only

---

[6]In February 1978, Paula was taking therapy at Cedars-Sinai Hospital twice a week. Each session lasted for at least a couple of hours.

meaning to her suffering." The court's child custody investigator like-wise recommended that Mona be given to Paula, but her only criticism of Barry as a parent was his aforementioned sending Mona to nursery school as he did. On the other hand, a psychiatrist who had interviewed Barry at length and observed him with Mona thought that Barry was the primary psychological parent of Mona and that he possessed a greater capacity for tending to Mona's needs and could provide her with more normal physical togetherness.

On March 31, 1977, some three weeks after the Levins separated, Barry was awarded pendente lite custody of Mona, but she was to spend alternate weekends with Paula. Four months later Paula's visitation rights were substantially increased. After the four-day custody hearing two years ago, the trial court awarded permanent custody of Mona to Barry on the ground that Mona's best interests so dictated (see Civ. Code, § 4600, subd. (b)) but Paula's substantial visitation rights on alternate weekends, vacations and holidays were expressly continued.

DISCUSSION

## A. The Governing Law

Last August, after the custody award here at issue had been made, our Supreme Court decided the aforementioned *In re Marriage of Carney, supra,* 24 Cal.3d 725, in which a father, who had become a quadriplegic, successfully challenged the trial court's taking of the custody of his two young boys from him on the basis of his physical handicap. (*Id.,* at pp. 729, 735-740.) At the outset of its opinion the court announced that it was "called upon to resolve an apparent conflict between two strong public policies: the requirement that a custody award serve the best interests of the child, and the moral and legal obligation of society to respect the civil rights of its physically handicapped members, including their right not to be deprived of their children because of their disability." (*Id.,* at p. 728.) ■ It stated that the health or physical condition of the parents may be taken into account in determining whose custody would best serve the child's interests, but that ordinarily this factor was of minor importance and that the court must view the handicapped parent as an individual and the family as a whole. It must determine whether the handicapped parent's condition will in fact have a substantial and lasting adverse effect on the best in-

terests of the child. (*Id.*, at p. 736.) According to the court, the essence of parenting lies "in the ethical, emotional, and intellectual guidance the parent gives to the child throughout his formative years, and often beyond." However limited a handicapped parent's bodily strength may be, that parent is a whole person to the child who needs his affection, sympathy and wisdom to deal with the problems of growing up and his handicap may well be an asset as "few can pass through the crucible of a severe physical disability without learning enduring lessons in patience and tolerance." (*Id.*, at p. 739.)

## B. The Trial Court's Error

At the conclusion of the child custody hearing before it, the trial court tried at some length to explain to the Levins the award it was about to make. It stated that its decision in this respect was based "100 percent on the welfare of the child" (see Civ. Code, § 4600, subd. (b)) and it remarked that both parents were good parents. It thereafter referred to the conclusions of Barry's expert witness that Mona knew Barry better than Paula because she had spent more time with him. It subsequently, however, concluded its remarks by saying:

"I don't know where I, as the judge, would have the right to say to this child, 'I am going to give you the opportunity during much of your week, during a substantial majority of your time of learning to deal with difficulties and adversities.' Even though we know that children of the poor do as well as children of the rich, maybe better, still a judge can't say to a child, 'You be poor.' I can't do that.

"Where I have nothing else to choose between the two, and let's assume that is what I had, how can I say to the child, 'I am going to put you with a parent where you are going to have more responsibilities. I am not going to let you be with a parent that has more freedom of movement. Why? For your own good.'

". . . . . . . . . . . . . . . .

"But as a judge faced with the responsibility of deciding what to do with a child of two years and nine months, why should I say to that child, 'I am not going to give you the same kind of freedom. I am going to give you to a parent that does not have as much freedom.' I can't do that. My conscience wouldn't let me do that.

"I find that kind of freedom must be what the court should take into consideration. It's not just the fact of tying shoes. Nobody knows better than Mrs. Levin how many difficulties are involved in any handicap more than the average, and I don't have any real doubt.

"I was anxious to learn as much as I could about these people. I have learned as much as I can. I feel that in the best interest of this child she should be with the father. And I do that not because of the handicap but because of the limitations that the handicap imposes upon what I conceive to be the most normal, possible life for a child."

From these concluding remarks of the trial court which we have just quoted, it is quite apparent that it based its permanent custody award of Mona to Barry on "the limitations that the handicap imposes upon what I conceive to be the most normal, possible life for a child." ■ As we read *Carney* this is an impermissible basis for a child custody award where one parent is physically handicapped. It does not represent an accommodation of the apparently conflicting public policies of the best interests of the child and the handicapped parent's right not to be deprived of her child because of that handicap. Under *Carney*, as we have already indicated, a trial court must determine whether the handicapped parent's condition will in fact have "a substantial and lasting adverse effect on the best interests of the child." (24 Cal.3d at p. 736.) In making this determination the court must consider the fact that the essence of parenting is ethical, emotional, and intellectual guidance of the child—something which, by and large, is generally unrelated to the physical handicap of a parent.

■ The trial court, though, in this case, unlike *Carney*, did have a sound basis upon which it might have properly awarded permanent custody of Mona to Barry. This was that except for approximately nine months of Mona's life, she had largely been solely in Barry's custody and he had apparently done an excellent job of parenting during those years. (See *Fine* v. *Denny* (1952) 111 Cal.App.2d 402, 403-404 [244 P.2d 983]; *Frazier* v. *Frazier* (1953) 115 Cal.App.2d 551, 559 [252 P.2d 693].) A child's custody, especially that of a comparatively young child, should not be changed except for very compelling reasons. (See *Connolly* v. *Connolly* (1963) 214 Cal.App.2d 433, 436 [29 Cal.Rptr. 616].) Stability and security in a child's environment are essential for both a child's happiness and its proper development.

But Paula is entitled to a new custody hearing in view of the improper basis that the trial court chose in this case. Custody of Mona should remain with Barry, however, pending a hearing for the reasons just stated.

The new permanent custody award will be entirely up to the trial court which will have two more years of Mona's childhood to weigh. We recommend strongly to both Barry and Paula that one or both apply at such hearing for joint custody of Mona since joint custody has so very recently become the preferred type of custody in California (Civ. Code, § 4600, subd. (b)(1)) and could possess obvious advantages in this case.

### Disposition

The child custody provisions of the interlocutory judgment of dissolution are reversed. Otherwise the judgment is affirmed. The minor child of the parties (Mona Beth Levin) is to remain in the custody of her father, Barry L. Levin, pending the outcome of a new child custody hearing.

Allport, J., and Potter, J., concurred.