[L.A. No. 31957. Sept. 22, 1986.]

ANA MARIE BURCHARD, Plaintiff and Appellant, v.
WILLIAM GARAY, Defendant and Respondent.

COUNSEL

Gary C. Wunderlin and Allard, Shelton & O'Connor for Plaintiff and Appellant.

Arnold H. Johnson for Defendant and Respondent.

OPINION

**BROUSSARD, J.**—This case concerns the custody of William Garay, Jr., age two and one-half at the date of trial. Ana Burchard, his mother, appeals from an order of the superior court awarding custody to the father, William Garay.

As a result of a brief liaison between Ana and William, Ana became pregnant. Early in her term she told William that she was pregnant with his child, but he refused to believe that he was the father. William, Jr., was born on September 18, 1979.

After the birth, Ana undertook the difficult task of caring for her child, with the help of her father and others, while working at two jobs and continuing her training to become a registered nurse. William continued to deny paternity, and did not visit the child or provide any support.

In the spring of 1980 Ana brought a paternity and support action. After court-ordered blood tests established that William was the father, he stipulated to paternity and to support in the amount of $200 a month. Judgment entered accordingly on November 24, 1980. In December of that year William visited his son for the first time. In the next month he moved in with Ana and the child in an attempt to live together as a family; the attempt failed and six weeks later he moved out.

William asked for visitation rights; Ana refused and filed a petition for exclusive custody. William responded, seeking exclusive custody himself.

The parties then stipulated that pending the hearing Ana would retain custody, with William having a right to two full days of visitation each week.

At the onset of the hearing Ana requested a ruling that William must prove changed circumstances to justify a change in custody. William opposed the motion, arguing that the court need only determine which award would promote the best interests of the child. The court deferred ruling on the motion. The evidence at the hearing disclosed that William, Jr., was well adjusted, very healthy, well mannered, good natured, and that each parent could be expected to provide him with adequate care.

After hearing the evidence, the court issued a statement of decision in which it impliedly ruled that the changed-circumstance rule did not apply because "there has been no prior de facto nor de jure award of custody to either parent." Applying the "best interests" test, it awarded custody to William. Its decision appears to be based upon three considerations. The first is that William is financially better off—he has greater job stability, owns his own home, and is "better equipped economically . . . to give constant care to the minor child and cope with his continuing needs." The second is that William has remarried, and he "and the stepmother can provide constant care for the minor child and keep him on a regular schedule without resorting to other caretakers"; Ana, on the other hand, must rely upon babysitters and day care centers while she works and studies. Finally, the court referred to William providing the mother with visitation, an indirect reference to Ana's unwillingness to permit William visitation.

Pursuant to the court order William took custody of the child on August 15, 1982. Ana appealed from the order, and sought a writ of supersedeas. The Court of Appeal, however, denied supersedeas and subsequently affirmed the trial court's order. We granted a hearing in August 1984. Ana did not seek supersedeas, and William, Jr., remained in his father's custody pending this appeal.

We begin with a brief summary of our decision. The petition for hearing raised the question whether the changed-circumstance rule applies in a case such as this. We conclude that it cannot apply. The rule requires that one identify a prior custody decision based upon circumstances then existing which rendered that decision in the best interest of the child. The court can then inquire whether alleged new circumstances represent a significant change from preexisting circumstances, requiring a reevaluation of the child's custody. Here there is no prior determination; no preexisting circumstances to be compared to new circumstances. The trial court has no alternative but to look at all the circumstances bearing upon the best interests of the child.

But although we conclude that the trial court correctly ruled that the case was governed by the best-interest standard, we find that it erred in applying that standard. The court's reliance upon the relative economic position of the parties is impermissible; the purpose of child support awards is to ensure that the spouse otherwise best fit for custody receives adequate funds for the support of the child. Its reliance upon the asserted superiority of William's child care arrangement suggests an insensitivity to the role of working parents. And all of the factors cited by the trial court together weigh less to our mind than a matter it did not discuss—the importance of continuity and stability in custody arrangements. We therefore reverse the order of the trial court.

Upon beginning a more detailed analysis, we first consider the function of the changed-circumstance rule in child custody proceedings. ■ In deciding between competing parental claims to custody, the court must make an award "according to the best interests of the child" (Civ. Code, § 4600, subd. (b)). This test, established by statute, governs all custody proceedings. (*In re B.G.* (1974) 11 Cal.3d 679, 695-696 [114 Cal.Rptr. 444, 523 P.2d 244].) The changed-circumstance rule is not a different test, devised to supplant the statutory test, but an adjunct to the best-interest test. It provides, in essence, that once it has been established that a particular custodial arrangement is in the best interests of the child, the court need not reexamine that question. Instead, it should preserve the established mode of custody unless some significant change in circumstances indicates that a different arrangement would be in the child's best interest. The rule thus fosters the dual goals of judicial economy and protecting stable custody arrangements. (*In re Marriage of Carney* (1979) 24 Cal.3d 725, 730-731 [157 Cal.Rptr. 383, 598 P.2d 36, 3 A.L.R.4th 1028]; *Connolly* v. *Connolly* (1963) 214 Cal.App.2d 433, 436 [29 Cal.Rptr. 616].)

"The change of circumstances standard is based on principles of res judicata." (Sharp, *Modification of Agreement-Based Custody Decrees: Unitary or Dual Standard?* (1982) 68 Va.L.Rev. 1263, 1264, fn. 9.) The rule established in a majority of jurisdictions, which we here endorse, applies that standard whenever custody has been established by judicial decree.[1] A minority of states limit the standard further, applying it only when custody was determined through an adversarial hearing.[2] No state, so far as we have

---

[1]Justice Mosk's concurring opinion restates Professor Sharp's arguments in favor of the majority rule. (See conc. opn., pp. 548-550, citing Sharp, *op. cit. supra,* 68 Va.L.Rev. 1263, 1271-1288.) These arguments were not advanced to support, and do not support, an extension of the changed-circumstance standard to cases of de facto custody.

[2]California followed the minority standard from 1962, when *Loudermilk* v. *Loudermilk* (1962) 208 Cal.App.2d 705 [25 Cal.Rptr. 434], was decided, until 1979 when *Loudermilk* was overruled by *In re Marriage of Carney, supra,* 24 Cal.3d 725, 731, footnote 4.

ascertained, applies the changed-circumstance standard when there has been no prior judicial determination of custody.

■ Ana argues that the trial court erred in failing to apply the changed-circumstance rule in the present case. But on close review of her argument it becomes clear that Ana does not claim that there has been a prior custody determination, and that the court should have examined only events which occurred subsequent to that determination. Instead, she argues simply that because she has had custody for a significant period, she and William do not start on an equal basis; instead, he should have the burden of persuading the court that a change in custody is essential or expedient for the welfare of the child. ■ We agree in substance with this argument: in view of the child's interest in stable custodial and emotional ties, custody lawfully acquired and maintained for a significant period will have the effect of compelling the noncustodial parent to assume the burden of persuading the trier of fact that a change is in the child's best interest. That effect, however, is different from the changed-circumstance rule, which not only changes the burden of persuasion but also limits the evidence cognizable by the court.

We illustrate this distinction by reference to *In re Marriage of Carney, supra,* 24 Cal.3d 725, the case Ana cites when she contends that the changed-circumstance rule can apply without a prior custody determination. When William and Ellen Carney separated in 1972, they entered into a written agreement under which Ellen relinquished custody of their two sons to William. In 1976 William was severely injured, his legs paralyzed, and the use of his hands and arms impaired. When in 1977 William filed for dissolution of the marriage, Ellen requested sole custody of the children, although she had not seen them nor contributed to their support since 1972. The trial court granted her request on the ground that William, because of his handicap, would be unable to have a normal father-son relationship with his boys.

Our opinion first noted that the statutory preference for maternal custody of a child of tender years has been repealed; under Civil Code section 4600 "the sole concern, as it should be, is 'the best interests of the child.'" (P. 730.) That issue, we observed, arose here in a "special way" (*ibid.*), for although there had been no prior court order, Ellen was in effect asking for a change in an established mode of custody to which she had agreed. We therefore inquired whether William's handicap represented a change in circumstances sufficient to justify a change in custody.

The trial court's conclusion that William's handicap would prevent him from raising his children properly, we found, was based not upon the evidence at trial, but upon a misunderstanding concerning the capabilities

of handicapped persons, and a stereotyped view that a father must be able to engage in physical activities with his sons. We explained how handicapped persons can in fact engage in many activities with their children. But on a deeper level, we observed, "the stereotype is false because it fails to reach the heart of the parent-child relationship. . . . Its essence lies in the ethical, emotional, and intellectual guidance the parent gives to the child throughout his formative years, and often beyond. . . . [William's] capacity to do so is entirely unrelated to his physical prowess: however limited his bodily strength may be, a handicapped parent is a whole person to the child who needs his affection, sympathy, and wisdom to deal with the problems of growing up." (P. 739.) We therefore reversed the order depriving William of custody.

The *Carney* decision, it is clear, did not turn on any difference in result between the changed-circumstance rule and the best-interest standard. We spoke in terms of changed circumstances simply because William Carney's injury occurred after he had held custody for a significant time. There is not the slightest suggestion that the best interests of the children required an award to the mother, and that she lost only because she did not also prove a significant change in circumstances.

In sum, *Carney* had nothing to say on the importance of protecting prior custody determinations by forbidding the courts from reconsidering the circumstances which led to those determinations. Instead, it spoke of the importance of protecting established modes of custody, however created, not by limiting the breadth of the evidence, but by requiring the noncustodial party to show that a change would be in the best interests of the child. Consequently, we do not read *Carney* as requiring use of a changed-circumstance test in cases where there has been no prior custody determination, but as one affirming the importance of stability in custody arrangements, placing the burden upon the person seeking to alter a long-established arrangement.

The contrary view of *Carney*—that it extends the changed-circumstance rule to protect a "de facto" custody[3]—is in our opinion unsound, unworkable, and potentially harmful. It is unsound because, absent some prior determination of the child's best interests as of some past date, the courts have no warrant to disregard facts bearing upon that issue merely because

---

[3]The parties use the term "de facto custody" to refer to custody established without a court order. Strictly speaking, Ana's custody of William, Jr., was "de jure," since under Civil Code section 197 as a matter of law an unmarried woman acquires sole custody of her child at birth when there is no presumed father.

such facts do not constitute changed circumstances.[4] It is unworkable because, as we have explained, absent such a prior determination the courts have no established basis on which they can assess the significance of any change. And it is potentially harmful because it could compel the court to make an award inconsistent with the child's best interest.[5]

In most cases, of course, the changed-circumstance rule and the best-interest test produce the same result. When custody continues over a significant period, the child's need for continuity and stability assumes an increasingly important role.[6] That need will often dictate the conclusion that maintenance of the current arrangement would be in the best interests of that child. But there will be occasional cases where it makes a difference. Consider, for example, a case in which a couple separate, and in the emotional turmoil of the separation the less suitable spouse takes custody of the child. In a later custody proceeding, the noncustodial parent may be able to prove that the custodial parent is unable to provide proper care, but not that his or her ability to do so has deteriorated since the separation. In such a case the changed-circumstance rule might require the court to confirm a custody not in the best interest of the child. Or, to take another example, a child may be born out of wedlock to a woman who for some reason is

---

[4]Ana suggests at one point that the paternity judgment is the critical event establishing custody, and that the trial court should have focused on whether circumstances had changed since rendition of that judgment. The custody of William, Jr., however, was not at issue in that proceeding; the stipulated judgment says nothing on the subject, and there is no showing that William, Sr., by agreeing to that judgment, acknowledged that Ana's custody was in the best interest of their child.

[5]The risk of harm to the child would be reduced, but not eliminated, by requiring a rather long period of custody before it becomes "significant" enough to invoke the changed-circumstances rule. *Carney* involved five years between custody and trial, but *Speelman* v. *Superior Court* (1983) 152 Cal.App.3d 124 [199 Cal.Rptr. 784] found a nine-month period sufficient. The present case involves a period of sixteen months if dated from the child's birth, seven months if from the paternity judgment, and five months from the date of separation.

In theory, however, the duration between a prior custody determination and a later trial is immaterial to the application of the changed-circumstance rule. Once it has been determined that a particular custody serves the child's best interests, a party seeking to change custody must show a change in circumstances, whether he brings his action two weeks after the determination or ten years later.

[6]The child's need for and right to stability and continuity have been widely recognized. (See, e.g., *Michael U.* v. *Jamie B.* (1985) 39 Cal.3d 787, 795, fn. 7 [218 Cal.Rptr. 39, 705 P.2d 365] (opn. of Broussard, J.); *In re Marriage of Carney, supra*, 24 Cal.3d 725, 730-731; *Hafer* v. *Superior Court* (1981) 126 Cal.App.3d 856, 866 [179 Cal.Rptr. 132]; *In re Marriage of Levin* (1980) 102 Cal.App.3d 981, 988 [162 Cal.Rptr. 757]; *Adoption of Michelle T.* (1975) 44 Cal.App.3d 699, 706-707 [117 Cal.Rptr. 856, 84 A.L.R.3d 654]; Uniform Child Custody Jurisdiction Act, 9 West's U. Laws. Ann. (1979 ed.) Matrimonial, Fam. & Health Laws, comrs. note, p. 112; Musewicz, *The Failure of Foster Care: Federal Statutory Reform and the Child's Right to Permanence* (1981) 54 So.Cal.L.Rev. 633, 647; Goldstein et al., Beyond the Best Interests of the Child (new ed. 1979) pp. 31-52; Fanshel & Shinn, Children in Foster Care (1978) pp. 477-478; Pike et al., Permanent Planning for Children in Foster Care (1977) pp. 1-2.)

not able to give it suitable care. The changed-circumstance rule would require the father, when he seeks custody, to prove not only that the mother is unsuitable, but that she has become more so since the baby's birth. In this example, the changed-circumstance rule again might require the court to endorse a custodial arrangement harmful to the child.[7]

■ We conclude that custody in the present case should be decided on the basis of the best interests of the child without requiring William to prove in addition that changed circumstances render it essential that he receive custody. ■ We therefore turn to examine the decision of the trial court to determine whether it abused its discretion in deciding that the best interests of the child required it to award custody to William.

The trial court's decision referred to William's better economic position, and to matters such as homeownership and ability to provide a more "wholesome environment" which reflect economic advantage. But comparative income or economic advantage is not a permissible basis for a custody award. "[T]here is no basis for assuming a correlation between wealth and good parenting or wealth and happiness." (Klaff, *The Tender Years Doctrine: A Defense* (1982) 70 Cal. L. Rev. 335, 350; see Mnookin, *Child Custody Adjudication: Judicial Function in the Face of Indeterminacy* (1975) 39 Law. & Contemp. Probs. 226, 284.) If in fact the custodial parent's income is insufficient to provide proper care for the child, the remedy is to award child support, not to take away custody.

The court also referred to the fact that Ana worked and had to place the child in day care, while William's new wife could care for the child in their

---

[7]To avoid the danger that the changed-circumstances rule might dictate a result harmful to the child's best interests, Justice Mosk's concurring opinion suggests two possible ways to modify that rule. The first is that "when the noncustodial parent shows that custody has remained unchanged but inadequate since its inception, he need prove only that a change is essential or at least expedient for the welfare of the child in order to obtain custody." (Conc. opn., p. 550.) We assume that "welfare of the child" is equivalent to "best interests of the child." If so, this proposal would permit the noncustodial parent to prevail by showing that a change in custody would promote the best interests of the child as demonstrated by either changed or unchanged circumstances. So modified, the changed-circumstances test is identical to the statutory best-interests test.

Justice Mosk's second proposal would eliminate the changed-circumstances requirement entirely, even for cases in which custody was established by judicial decree. In all cases, he suggests, the noncustodial parent need only show "present necessity to change custody for the child's welfare." (Conc. opn., fn. 1, p. 551.) Again, this is analytically identical to the best-interests test. We find it paradoxical that the concurring opinion would advocate applying the changed-circumstance test in a case of de facto custody, a setting in which that test had never been applied in the past, yet recommend that in future cases we consider abolishing any requirement for proof of changed circumstances and apply a standard logically identical to the best-interest test even when custody was established by judicial decree.

home. But in an era when over 50 percent of mothers[8] and almost 80 percent of divorced mothers[9] work, the courts must not presume that a working mother is a less satisfactory parent or less fully committed to the care of her child. A custody determination must be based upon a true assessment of the emotional bonds between parent and child, upon an inquiry into "the heart of the parent-child relationship . . . the ethical, emotional, and intellectual guidance the parent gives to the child throughout his formative years, and often beyond." (*In re Marriage of Carney, supra,* 24 Cal.3d 725, 739.) It must reflect also a factual determination of how best to provide continuity of attention, nurturing, and care. It cannot be based on an assumption, unsupported by scientific evidence, that a working mother cannot provide such care—an assumption particularly unfair when, as here, the mother has in fact been the primary caregiver.[10]

Any actual deficiency in care, whether due to the parent's work or any other cause, would of course be a proper consideration in deciding custody. But the evidence of such deficiencies in the present case is very weak—the testimony of William, disputed by Ana, that on one occasion Ana left the child alone briefly while she cashed a support check, and that sometimes the child was delivered for visitation in clothes that were shabby or too small. But these matters are trivial. The essence of the court's decision is simply that care by a mother who, because of work and study, must entrust the child to daycare centers and babysitters, is per se inferior to care by a father who also works, but can leave the child with a stepmother at home. For the reasons we have explained, this reasoning is not a suitable basis for a custody order.

The trial court recited other grounds for its order. One was that William was "better equipped psychologically" to care for the child. Ana has had emotional problems in the past, and reacted bitterly to the separation, but William's conduct has not been a model of emotional maturity. After they separated, Ana objected to William seeing the child and did not communicate about matters involving the child.[11] But after William obtained custody pursuant to the trial court's order, he proved equally obdurate to Ana's

---

[8]Atkinson, *Criteria for Deciding Child Custody in the Trial and Appellate Courts* (1984) 18 Fam.L.Q. 1, 15.

[9]Steinman, *Joint Custody: What We Know, What We Have Yet to Learn, and the Judicial and Legislative Implications* (1984) 16 U.C.Davis L.Rev. 739, 740.

[10]We suspect that any presupposition that single working parents provide inferior care to their children will in practice discriminate against women. Divorced men are more likely to remarry than divorced women, and far more likely to marry a nonworking spouse.

[11]Conduct by a custodial parent designed to frustrate visitation and communication may be grounds for changing custody. (*Speelman* v. *Superior Court, supra,* 152 Cal.App.3d 124, 132.)

visitation rights, leading the court to amend its order to spell out those rights.

All of these grounds, however, are insignificant compared to the fact that Ana has been the primary caretaker for the child from birth to the date of the trial court hearing,[12] that no serious deficiency in her care has been proven, and that William, Jr., under her care, has become a happy, healthy, well-adjusted child. We have frequently stressed, in this opinion and others, the importance of stability and continuity in the life of a child, and the harm that may result from disruption of established patterns of care and emotional bonds. The showing made in this case is, we believe, wholly insufficient to justify taking the custody of a child from the mother who has raised him from birth, successfully coping with the many difficulties encountered by single working mothers. We conclude that the trial court abused its discretion in granting custody to William, Sr., and that its order must be reversed.

We acknowledge the anomalous position of an appellate court, especially a supreme court, in child custody appeals. Over four years have passed since the trial court awarded custody to William. Our decision reversing that order returns the case to the trial court which, in deciding the child's future custody, must hold a new hearing and determine what arrangement is in the best interests of the child as of the date of that hearing. (See *In re Marriage of Carney, supra,* 24 Cal.3d 725, 741; *In re Marriage of Russo* (1971) 21 Cal.App.3d 72, 93-94 [98 Cal.Rptr. 501] and cases there cited.) Thus, the effect of our decision is not to determine finally the custody of William, Jr., but is to relieve Ana of the adverse findings of the trial court and of the burden of proving changed circumstances since the trial court order, and to make clear that in deciding the issue of custody the court cannot base its decision upon the relative economic position of the parties or upon any assumption that the care afforded a child by single, working parents is inferior.

The order is reversed.

Bird, C. J., Reynoso, J., and Grodin, J., concurred.

**BIRD, C. J.,** Concurring.—I write separately to underscore that the trial court's ruling was an abuse of discretion not only in its failure to give due weight to the importance of continuity and stability in custody arrangements but in its assumption that there is a negative relation between a woman's

---

[12]During the six-week period when Ana and William lived together, Ana remained the primary caregiver, and the couple continued the daycare and babysitting arrangements Ana had made.

lack of wealth or her need or desire to work and the quality of her parenting. As this case so aptly demonstrates, outmoded notions such as these result in harsh judgments which unfairly penalize working mothers.

The trial court's primary reason for awarding custody to William was that Ana worked and had to place her child in day care, while William could afford to have his new wife quit her job and stay home. The court's other reason was William's larger income. No other facts appear in the record to justify the court's ruling. Today's decision ought to make it crystal clear that neither of these reasons is a proper basis for an award of custody.

Read in light of the record, the court's findings amount to "outmoded notions of a woman's rule being near hearth and home." (*Gulyas* v. *Gulyas* (1977) 75 Mich.App. 138 [254 N.W.2d 818, 823] (dis. opn. of Riley, J.).) In an era where over 50 percent of mothers[1] and almost 80 percent of divorced mothers[2] work, this stereotypical thinking cannot be sanctioned. When it is no longer the norm for children to have a mother at home all day, courts cannot indulge the notion that a working parent is ipso facto a less satisfactory parent. Such reasoning distracts attention from the real issues in a custody dispute and leads to arbitrary results.

The court's reliance on the father's greater income was equally inappropriate. The child's best interests—especially when the child is very young—cannot be assessed in such materialistic terms. "[T]here is no basis for assuming a correlation between wealth and good parenting or wealth and happiness." (Klaff, *The Tender Years Doctrine: A Defense* (1982) 70 Cal.L.Rev. 335, 350; see *Dempsey* v. *Dempsey* (1980) 96 Mich.App. 276 [292 N.W.2d 549, 554, mod. 409 Mich. 495 [296 N.W.2d 813].) In fact, common experience suggests that there is no such correlation.

Stability, continuity, and a loving relationship are the most important criteria for determining the best interests of the child. (Maj. opn., *ante,* at pp. 538, 541.) Implicit in this premise is the recognition that existing emotional bonds between parent and child are the first consideration in any best-interests determination.

This court acknowledged that fact when it recently held that a parent's physical handicaps were irrelevant to "the heart of the parent-child rela-

---

[1] Gottfried et al., Maternal Employment and Young Children's Development: A Longitudinal Investigation, paper presented at the Annual Meeting of the American Psychological Association (Aug. 1985); Atkinson, *Criteria for Deciding Child Custody in the Trial and Appellate Courts* (1984) 18 Fam.L.Q. 1, 15.

[2] Steinman, *Joint Custody: What We Know, What We Have Yet to Learn, and the Judicial and Legislative Implications* (1984) 16 U.C.Davis L.Rev. 739, 740.

tionship[] . . . the ethical, emotional, and intellectual guidance the parent gives to the child throughout his formative years, and often beyond." (*In re Marriage of Carney* (1979) 24 Cal.3d 725, 739 [157 Cal.Rptr. 383, 598 P.2d 36, 3 A.L.R.4th 1028].) A custody determination must be based on a true assessment of these emotional bonds. It must reflect a factual determination of how best to provide continuity of attention, nurturing, and care. It cannot be based on a presumption that a working mother does not or cannot provide such care.

When the record contains no evidence as to which parent does provide this care, clearly the "working mother" factor operates as a negative presumption. Even more clearly, this factor operates unfairly when the record indicates that the mother has in fact been the primary caregiver. The use of such a presumption as a basis for a custody award is of dubious constitutionality.[3]

Furthermore, the presumption is inappropriate because the relationship between maternal employment and the "presumed facts" about the child's best interests is not supported by reason or experience. Typically, it is the mother who provides most day-to-day care, whether or not she works outside the home. (Neely, *The Primary Caretaker Parent Rule: Child Custody and the Dynamics of Greed* (1984) 3 Yale L. & Policy Rev. 168, 172; cf. Klaff, *op. cit. supra,* 70 Cal.L.Rev. at p. 344, fn. 56.) A presumption which ignores this fact is likely to lead to erroneous and unfair decisions.

Moreover, there is no accepted body of expert opinion that maternal employment per se has a detrimental effect on a child. On the contrary, one recent study on maternal employment and child development has concluded that "[m]aternal employment status had no negative relation to children's development over a 5-year period. . . . Public policy needs to move in the direction of more flexible work arrangements for mothers, towards enhancing the quality of the environment provided for children, towards enhancing the personal satisfaction of careers for women, and towards promoting the view that maternal employment has no negative influence on children's development." (Gottfried et al., *op. cit. supra.*) Thus, the trial court's presumption lacks any expert support.

---

[3]Compare *Jarrett* v. *Jarrett* (1979) 78 Ill.2d 337 [400 N.E.2d 421], certiorari denied (1980) 449 U.S. 927 [66 L.Ed.2d 155, 101 S.Ct. 329]. Dissenting from denial of certiorari, Justices Brennan and Marshall severely criticized an award of custody to the father based on what was in effect a conclusive presumption that the mother's cohabitation with a man to whom she was not married rendered her unfit. Such a presumption, the justices pointed out, violated the teaching of *Stanley* v. *Illinois* (1972) 405 U.S. 645 [31 L.Ed.2d 551, 92 S.Ct. 1208] that parental fitness must be determined on the facts of each case and not by application of conclusive presumptions. (449 U.S., at pp. 929-930 [66 L.Ed.2d at pp. 156-157].)

The burden of the trial court's reasoning would certainly fall most heavily on women. In those cases where the father contests custody,[4] he is the parent likely to have superior economic resources. (Weitzman, *The Economics of Divorce: Social and Economic Consequences of Property, Alimony and Child Support Awards* (1981) 28 UCLA L.Rev. 1181, 1241.) This alone would give him an advantage under the trial court's reasoning. Further, such resources may well include the ability to support a nonworking spouse. Conversely, the mother is likely to have no choice about working, particularly if she does not remarry. (*Weitzman, op. cit. supra,* at p. 1230, fn. 175.) In the 25 to 44 age range, the remarriage rate of divorced men is almost double that of divorced women. (Polikoff, *op. cit. supra,* 7 Women's Rights L. Rep. at p. 241, fn. 51, citing Nat. Center for Health Statistics, U.S. Dept. of Health & Human Services, Pub. No. (PHS 80-1120), Vital Statistics Rep., Final Marriage Statistics, 1978 (Sept. 12, 1980) p. 6.)

Yet, under the trial court's rationale, it is the mother—and not the father—who would be penalized for working out of the home. She and she alone would be placed in this Catch-22 situation. If she did not work, she could not possibly hope to compete with the father in providing material advantages for the child. She would risk losing custody to a father who could provide a larger home, a better neighborhood, or other material goods and benefits.[5]

---

[4]Though custody is awarded to mothers in 90 percent of the divorces with minor children, this appears to be due to the fact that fathers seldom request custody. (Polikoff, *Why are Mothers Losing: A Brief Analysis of Criteria Used in Child Custody Determinations* (1982) 7 Women's Rights L. Rep. 235, 236; Klaff, *op. cit. supra,* 70 Cal.L.Rev. at p. 335, fn. 3; Lemon, *Joint Custody as a Statutory Presumption: California's New Civil Code Sections 4600 and 4600.5* (1981) 11 Golden Gate L.Rev. 485, 486, 529.) In the 15 to 20 percent of cases where fathers request custody, they are successful roughly half the time. (Polikoff, *op. cit. supra,* at p. 236; Atkinson, *op. cit. supra,* 18 Fam.L.Q. 1, 10-11.)

[5]For example, in *Porter* v. *Porter* (N.D. 1979) 274 N.W.2d 235, the reviewing court affirmed a custody award to a working father because "he is in a position to lend more stability and guidance to nurturing the development of the children during those periods of time in which he would not be actually pursuing his employment . . . ." (*Id.,* at p. 241.) As the wife had forsaken a career during marriage to care for the children, the husband's earning capacity was substantially greater than hers. It was this greater earning capacity which apparently was the source of his "stability and guidance." (*Id.,* at pp. 241-242.)

Conversely, in *Dempsey* v. *Dempsey, supra,* 292 N.W.2d 549, the reviewing court emphatically reversed a trial court's custody award to a father which had been based on his superior earnings. The mother had cared full time for three small children, one of whom was epileptic and required special care. She had also done all the housework, chauffeuring, and parent-teacher activities during the marriage. As a result, her earning ability was low. She had sought a divorce on the ground that the father did not spend any of his leisure time with the family. The trial court nonetheless awarded the father most of the joint property as well as custody of the children. It suggested that in light of the father's uncertain child care arrangements the mother could provide day care as a form of in-kind child support. (*Id.,* at pp. 550-551.)

Reversing, the reviewing court held that "it can be argued that economic circumstances never should be conclusively determinative. The reason is plain. In most cases the mother

If she did work, she would face the prejudicial view that a working mother is by definition inadequate, dissatisfied with her role, or more concerned with her own needs than with those of her child. This view rests on outmoded notions of a woman's role in our society. Again, this presumption is seldom, if ever, applied even-handedly to fathers.[6] The result—no one would take an unbiased look at the amount and quality of parental attention which the child was receiving from each parent.

The double standard appears again when, as here, the father is permitted to rely on the care which someone else will give to the child. It is not

will be disadvantaged, although with changing life patterns this is not always so. It is not merely a question of prejudicial effect upon mothers; the danger in placing undue reliance on economic circumstances is its potential prejudicial effect upon the child's best interests. The party with the more modest economic resources should not be excluded from equal consideration as the custodial parent. If the parties are substantially different as to economic circumstances, the court has ample power through its orders, if it be in the best interests of the child or children, to equalize those circumstances." (*Id.*, at p. 554.)

[6]For example, in *In re Marriage of Levin* (1980) 102 Cal.App.3d 981, 983, footnote 1 [162 Cal.Rptr. 757], the Court of Appeal dismissed the notion that the father's performance as an "excellent custodial parent" was impaired by placing the child in nursery school at the minimum age of two years on a nearly full-time basis.

See also *In re Marriage of Estelle* (Mo.App. 1979) 592 S.W.2d 277, in which the court affirmed a custody award to a working father, not remarried, as against an equally fit working mother. The reviewing court made no negative comments about the child's placement in day care, but rather emphasized that the father often prepared the child's breakfast and dinner and picked her up from the day care center himself. (*Id.*, at p. 278.) It is difficult to imagine a mother's performance of these chores even attracting notice, much less commendable comment.

Other examples of the double standard include *Gulyas* v. *Gulyas, supra*, 254 N.W.2d 818, which affirmed a trial court's award to a father who worked a standard 40-hour week. The mother, a regional manager for H. & R. Block, worked 40 to 50 hours a week during tax season, but only 10 to 30 hours the rest of the year. She had greater flexibility in her work hours, she was at home when the child left for school and she picked the child up at a neighbor's home one or two hours after school. (See Note, *Family Law—Child Custody—Mother's Career May Determine Custody Award to Father* (1978) 24 Wayne L.Rev. 1159, 1165, fn. 44.) The father had recently undergone surgery for a brain tumor. (*Gulyas, supra*, 254 N.W.2d at p. 822 (dis. opn. of Riley, J.).)

In its award to the father, the trial court "repeatedly emphasized [the mother's] employment" (*ibid.*) and "noted that [the mother's] 'career and need for obtaining a better livelihood has diminished her manifested ability to care for the child other than in Day Care homes.'" (*Ibid.*) The trial court "did *not* remark upon [the father's] inability personally to care for the child during his working hours." (*Ibid.*, italics added.) The court concluded that "the husband [was] more inclined towards the old fashioned virtues," that "the mother of the child is an energetic and ambitious career woman . . . and that the father of the child is perhaps less ambitious than the mother, but is more of a homebody." (*Ibid.*) These moralizing conclusions, supported only by the facts recited above, were sufficient to support an award of custody to the father. (*Id.*, at pp. 822-823.)

See also *Masek* v. *Masek* (1975) 89 S.D. 62 [228 N.W.2d 334], in which a mother who taught music part time lost custody to a father who worked full time. The trial court noted that the mother slept until 9 a.m. on Saturdays, failed to prepare breakfast for her husband who left for work at 7 a.m., and on occasion had run out of jam and cookies. (*Id.*, at p. 338, dis. opn. of Wallman, J.) It concluded from these facts that she was unfit for custody because her "primary interests are in her musical career and outside of the house and family." (*Id.*, at p. 337.)

uncommon for courts to award custody to a father when care will actually be provided by a relative, second wife, or even a babysitter. (See, e.g., *In re Marriage of Welbes* (Iowa 1982) 327 N.W.2d 756, and dis. opn. of McCormick, J., *id.*, at p. 759; *Bruner* v. *Bruner* (1982) 212 Neb. 473 [323 N.W.2d 104]; Atkinson, *op. cit. supra,* 18 Fam.L.Q. at p. 35.) However, the implicit assumption that such care is the equivalent of that which a nonworking mother would provide "comes dangerously close to implying that mothers are fungible—that one woman will do just as well as another in rearing any particular children." (Polikoff, *op. cit. supra,* 7 Women's Rights L. Rep. at p. 241; see also Klaff, *op. cit. supra,* 70 Cal.L.Rev. at p. 348, fn. 72.) This is scarcely consistent with any enlightened ideas of childrearing.

The reasons on which this trial court relied are discriminatory. They fall unequally on women and men. They penalize women for failing to conform to a 19th century role which is no longer possible or desirable for many. They imply that a woman who leaves her "proper sphere" to participate fully in modern life cannot be an adequate mother. Such a view denies full humanity to women. It cannot be tolerated in our courts.

To force women into the marketplace and then to penalize them for working would be cruel. It is time this outmoded practice was banished from our jurisprudence.

**MOSK, J.**—I concur in the reversal of the trial court order, but strongly disagree with the manner in which the majority reach that result—especially their tacit and far from candid overruling of *In re Marriage of Carney* (1979) 24 Cal.3d 725 [157 Cal.Rptr. 383, 598 P.2d 36, 3 A.L.R.4th 1028], and their denial of needed protection to an entire class of children solely because custody was not originally established by judicial decree.

In *Carney* a unanimous court held that regardless of how custody was originally established, a child will not be removed from the custody of one parent and given to the other unless the noncustodial parent shows that material facts and circumstances occurring subsequently are of a kind to render a change essential or at least expedient for the welfare of the child. (*Id.*, at pp. 730-731.) Put simply, the rule requires the proof of two ultimate facts: (1) a change in circumstances and (2) the present necessity for a change in custody.

In its two requirements the changed-circumstances rule serves two distinct objectives: the finality of judgments and the best interests of the child—in particular, his well recognized right to stability and continuity. (*Ibid.*; *Connolly* v. *Connolly* (1963) 214 Cal.App.2d 433, 436 [29 Cal.Rptr. 616].) In

the general common law the rule appears to have its historical roots in principles of res judicata. (Sharp, *Modification of Agreement-Based Custody Decrees: Unitary or Dual Standard?* (1982) 68 Va.L.Rev. 1263, 1264, fn. 9 [hereafter Sharp].) But in California it has for many years been understood to have as its primary and indeed controlling purpose the furtherance of the child's best interests. (See *Crater* v. *Crater* (1902) 135 Cal. 633, 634-635 [67 P. 1049]; *Carney, supra,* at pp. 730-731; *Washburn* v. *Washburn* (1942) 49 Cal.App.2d 581, 587 [122 P.2d 96].)

The majority's reading of *Carney* as not extending the protection of the changed-circumstances rule to so-called "de facto" as well as "de jure" custody is sheer sophistry. In *Carney* we expressly held that the rule applied "regardless of how custody was originally decided upon . . . ." (24 Cal.3d at p. 731, fn. 4.) We imposed on the noncustodial mother the burden of proving that a substantial change in circumstances had occurred. (*Id.* at p. 731.) And we concluded that she had not carried her burden. (*Id.* at p. 740.) It is difficult for me to conceive how we could have established the point more clearly. While I welcome the majority's generous quotations from the text of the *Carney* opinion, family law would have been better served if they had followed the principle declared therein.

More troubling, the majority's tacit overruling of *Carney* and its consequent limitation of the changed-circumstances rule to cases in which custody was originally established by judicial decree have untoward consequences and are unsound.

First, the limited application of the changed-circumstances rule that the majority adopt is in conflict with the primary purpose of the rule. The child whose custody was established by means other than judicial decree has the same need for and right to stability and continuity—and accordingly the same entitlement to the protection the rule is intended to provide—as the child whose custody was established by judicial decree. Because it is not unreasonable to assume that the children of two-parent and relatively more affluent families are disproportionately represented in the class of children whose custody was originally established by judicial decree, the majority's holding, I fear, will effectively deny needed protection disproportionately to children of single-parent and less affluent families.

Second, most states—including, until today, California—appear to require "changed circumstances" to modify custody regardless of how custody was originally established. (See Sharp, *supra,* 68 Va.L.Rev. at pp. 1265, 1268-1271, and cases and other authorities cited.) The rationale for this position was explained in *Carney*: "regardless of how custody was originally decided upon, after the child has lived in one parent's home for a significant period

it surely remains 'undesirable' to uproot him from his 'established mode of living,' and a substantial change in his circumstances should ordinarily be required to justify that result." (24 Cal.3d at p. 731, fn. 4; accord, Sharp, *supra,* at p. 1270.) That the cases—with the notable exception of *Carney*—involve a custody decree is plainly fortuitous: the fundamental question they all address is not whether to modify a *decree* but whether to change *custody.* No state, so far as I have ascertained, declines to apply the changed-circumstances rule when custody was not originally established by judicial decree. The majority, alone in the country, take that retrogressive step.

The majority claim that the *Carney* rule is "unsound, unworkable, and potentially harmful." Their argument in support, however, is hollow.

Their first point is that the *Carney* rule "is unsound because, absent some prior determination of the child's best interests as of some past date, the courts have no warrant to disregard facts bearing upon that issue merely because such facts do not constitute changed circumstances." But if the *Carney* rule is unsound for this reason, so is their newly created rule: even in cases in which custody is established by judicial decree, such a determination is seldom made.

In virtually all cases, it appears, the parents decide on custody in a negotiated settlement and thus do not dispute the question at a hearing. (See Sharp, *supra,* 68 Va.L.Rev. at pp. 1263-1264; accord, Mnookin & Kornhauser, *Bargaining in the Shadow of the Law: The Case of Divorce* (1979) 88 Yale L.J. 950, 951, fn. 3 [hereafter Mnookin & Kornhauser]; Kirshner, *Child Custody Determination—A Better Way!* (1978-1979) 17 J. Fam. L. 275, 286; Mnookin, *Child-Custody Adjudication: Judicial Functions in the Face of Indeterminacy* (1975) 39 Law & Contemp. Probs. 226, 232, fn. 22.) And in these cases "courts usually 'rubber-stamp' such agreements . . . ." (Sharp, *supra,* at p. 1279; see Mnookin & Kornhauser, *supra,* at p. 955, fn. 22; Kirshner, *supra,* at p. 286; Hansen, *The Role and Rights of Children in Divorce Actions* (1966) 6 J. Fam. L. 1, 2.) The percentage of cases in which a trial court initially determines custody in a contested manner is minuscule.

But the fact remains that even when custody is not adjudicated and indeed even when it is not established by judicial decree, we may nevertheless presume that such custody is in the child's best interest and as a result require the noncustodial parent to show that a material change of circumstances has subsequently occurred.

Such a presumption is justified when custody is established by agreement. "First, most parents genuinely love their children, and it is reasonable to

assume that the children's welfare is a vital consideration in the parents' decision to resolve their dispute by agreement. . . . Second, parents have a better informational base upon which to make a decision about custody. The adversarial process is an inadequate means to assemble sufficient 'facts' to resolve custodial disputes satisfactorily. Third, it is difficult to protect a child from the painful pull of divided loyalties when his parents fail to agree. Parental agreements help to preserve an atmosphere of at least superficial peace between parents and thereby facilitate a much easier and more meaningful future relationship between the child and the non-custodial parent." (Sharp, *supra,* 68 Va.L.Rev. at p. 1280, fn. omitted.)

Such a presumption is also justified when, as here, custody is established by default rather than by decision. First, as between the parent who undertakes to provide care and the parent who fails or refuses to do so, custody with the former must be deemed to serve the child's best interests. Thus, it is altogether reasonable to require the latter to demonstrate changed circumstances should he subsequently attempt to obtain custody. Second, as Dr. Andrew Watson, psychiatrist and professor of law, has observed, stability is "practically the principal element in raising children" and "a child can handle almost anything better than he can handle instability." (Proceedings of Special Com. on U. Marriage and Divorce Act, Nat. Conf. of Comrs. on U. State Laws 98, 101 (Dec. 15-16, 1968); accord, Bodenheimer, *The Uniform Child Custody Jurisdiction Act: A Legislative Remedy for Children Caught in the Conflict of Laws* (1969) 22 Vand.L.Rev. 1207, 1208-1209; see Watson, Psychiatry for Lawyers (1968) pp. 159, 197; Sharp, *supra,* 68 Va.L.Rev. at pp. 1280-1281; see also Clark, Law of Domestic Relations (1968) § 11.5 at p. 326 ["if [a child] is continually being transferred from one parent to the other . . . he may be a great deal worse off than if left with one parent, even though as an original proposition some better provision could have been made for him"].)

The majority's second point is that the *Carney* rule "is unworkable because, . . . absent such a prior determination the courts have no established basis on which they can assess the significance of any change." But "Identification of a base line against which to measure a subsequent change of conditions is not as difficult as the [majority] suggest. The simple fact is that a demonstration of changed conditions does not normally require a preexisting record of all the facts that prevailed at the time [custody was originally established] . . . . [¶] It is plausible therefore to suggest that the . . . concern about the necessity for a prior record is somewhat of a red herring." (Sharp, *supra,* 68 Va.L.Rev. at pp. 1285, 1287.)

The majority's final point is that the *Carney* rule "is potentially harmful because it could compel the court to make an award inconsistent with the

child's best interest." But the concern that application of the changed-circumstances rule in cases in which custody was not judicially established might leave a court helpless to intervene where there was no change in circumstances but the welfare of the child required a change in custody does not justify a limitation of the rule such as the majority have adopted. To begin with, the rule could theoretically leave the court helpless in any case in which it is applied—whether or not custody was originally established by judicial decree. The concern, therefore, is rooted not in the use of the rule in any particular class of cases but rather in a mechanical and formalistic use of the rule itself. In any event, "Nothing in the case law of the majority states, or in any of the literature in this area, suggests such a rigid application of the changed circumstances standard. . . . Clearly, courts can easily accommodate the 'worst case' hypothetical within existing law." (Sharp, *supra,* 68 Va.L.Rev. at p. 1288, fn. omitted.)

We ourselves have recognized that such an accommodation is possible. In *Munson* v. *Munson* (1946) 27 Cal.2d 659, 666 [166 P.2d 268], we stated: "This court has recognized [citation] that generally 'until some change of circumstances arises which makes a modification of the former order of custody advisable from the point of view of the welfare of the child, the court will give effect to the former order and will refuse to make any modification of such order,' but that there may be cases 'in which, despite the fact that there was apparently no change of circumstances, nevertheless, the welfare of the child might require that the previous order of custody be changed' . . . ."

In any case in which it is used, the changed-circumstances rule, if applied mechanically, might serve to lock a child into a bad situation. To prevent such a result—the goal the majority strive for but miss—I would adopt, in the proper case, the following limited exception: when the noncustodial parent shows that custody has remained unchanged but inadequate since its inception, he need prove only that a change is essential or at least expedient for the welfare of the child in order to obtain custody. Such an exception is of course consistent with the primary purpose of the rule, furthering as it does the child's best interests. It is also compatible with the flexible nature of the changed-circumstance rule. (See *Foster* v. *Foster* (1937) 8 Cal.2d 719, 728 [68 P.2d 719]; accord, *Munson* v. *Munson, supra,* 27 Cal.2d at p. 666.)[1]

---

[1]More radical would be a modification of the rule itself—the removal of the first or "changed-circumstances" requirement. Such a modification would evidently be proper when the rule is applied to cases in which custody was not originally established by judicial decree: the first requirement, which reflects principles of res judicata and serves the finality of judgments, is strictly inapplicable to such cases. This modification, however, would also be proper even where custody was originally so established. In practice the first requirement

In sum, the *Carney* rule rightly protects all children against needless change in custody and against the threat of such change. Whatever harm a mechanical application of the rule poses in unusual circumstances—which are not present here—can readily be prevented by permitting a pragmatic exception. The rule therefore should not be discarded; it should simply be modified if and when the need arises.

Lucas, J., concurred.

---

has no independent effect and thus may be eliminated without adverse consequences. Where there is neither (1) change in circumstances nor (2) present necessity to change custody for the child's welfare, the renewal of litigation is as effectively deterred by the second requirement as by the first. Where, by contrast, there is no change in circumstances but change in custody *is* essential, under longstanding precedents the first requirement may simply be dispensed with. (See *Munson* v. *Munson, supra,* 27 Cal.2d at pp. 666-667; *Foster* v. *Foster, supra,* 8 Cal.2d at p. 728; *Bogardus* v. *Bogardus* (1929) 102 Cal.App. 503, 506 [283 P. 127].)