Filed 4/22/15  In re K.F. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re K.F. et al., Persons Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>KRYSTAL M.,<br><br>Defendant and Appellant. | F069523<br><br>(Super. Ct. Nos. JD109781, JD109782, JD109783, JD121430)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  William D. Palmer, Judge.

Conness A. Thompson, under appointment by the Court of Appeal, for Defendant and Appellant.

Theresa A. Goldner, County Counsel, and Kelley D. Scott, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Mother Krystal M. lost custody of her four children. Her grandmother is the legal guardian of those children. Mother filed a petition asking the juvenile court to terminate guardianship based upon changed circumstances. The juvenile court denied mother's petition; it found changed circumstances, but concluded mother had not met her additional burden of showing termination of the guardianship would be in the children's best interest.

On appeal, mother argues the juvenile court abused its discretion because it "appears to have engaged in household best interest comparison" without fully addressing the best interests of the children. She argues that such a test provides an incomplete picture of "best interests." Had the court considered the proper factors, it would have concluded termination of guardianship was in the children's best interests. We disagree and hold the trial court's denial of mother's petition was not an abuse of discretion.

# BRIEF FACTUAL AND PROCEDURAL BACKGROUND[1]

A juvenile dependency petition concerning mother's oldest three children was filed in March 2006 following a domestic dispute between mother and the children's father. The petition alleged a failure to protect. Following the initial hearing, the children were detained from their father.

Thereafter, a subsequent petition was filed on April 12, 2006, additionally asserting mother had failed to protect the children from father, had tested positive for drug use, and that further acts of domestic violence had occurred between mother and the

---

[1]While we have reviewed the entire record on appeal, the specific issue here concerns the circumstances at the time of mother's 2014 petition to terminate guardianship. Thus, a more complete recitation of the facts and procedure is not warranted. The relevant facts and procedure are addressed more fully as necessary in our discussion.

father.  After a hearing, the children were detained from mother and were declared dependents pursuant to Welfare and Institutions Code[2] section 300, subdivision (b).

After a period of time, in 2008, the children were returned to mother's legal custody.  Thereafter, mother's fourth child, K.M., was born.

In July 2009, another dependency petition, alleging failure to protect, was filed following additional instances of domestic violence between mother and the father.  The four children were ordered detained and placed in foster care.

Dependency proceedings continued over the course of several years, with mother making some progress but not enough to warrant the return of the children to her home.  Throughout these proceedings, mother's drug use has been a constant issue.  Previously filed section 388 petitions were denied.

In August 2010, family reunification services were terminated.  In January 2011, legal guardianship was selected as the permanent plan.  The children's great-grandmother Alberta B. was appointed their guardian, and dependency jurisdiction was terminated.

In June 2012, new allegations of domestic violence arose, this time between mother and her boyfriend, as reflected in a related social study.  A July 2012 section 388 petition was denied on August 20, 2012.

Letters of guardianship issued for each of the children on April 30, 2013.

The section 388 petition that is the subject of this appeal was filed March 10, 2014.  The hearing was ultimately held June 10, 2014; the petition was denied.  Mother filed a notice of intent to file a writ petition that same date.

On June 13, 2014, on its own motion, this court deemed mother's notice of intent to be a notice of appeal.

---

[2]All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

3.

## DISCUSSION

Mother contends the trial court abused its discretion when it denied her section 388 petition because it engaged in an improper comparison of mother's household to that of the children's guardian. We reject mother's assertion.

A parent who seeks to terminate a permanent plan of legal guardianship must petition the court pursuant to section 388 and show by a preponderance of the evidence that changed circumstances or new evidence exists and the child's best interest would be served by a change in placement to the parent's home. (§ 366.3, subd. (b); *In re Michael D.* (1996) 51 Cal.App.4th 1074, 1081-1087.) Otherwise, it is presumed the child's continued care in his or her permanent plan is in the child's best interests. (§ 366.3, subd. (e).) Unlike its position when a child is in long-term foster care, the court need not consider all permanency planning options, including return of custody to the parent, when it reviews a legal guardianship. (§ 366.3, subd. (g).) Indeed, it is within the court's prerogative once a legal guardianship is established to dismiss its dependency jurisdiction over the child.

"'This determination [of whether to terminate a legal guardianship] was committed to the sound discretion of the juvenile court, and the trial court's ruling should not be disturbed on appeal unless an abuse of discretion is clearly established.… As one court has stated, when a court has made a custody determination in a dependency proceeding, "'a reviewing court will not disturb that decision unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.'"'" (*In re Michael D.*, *supra*, 51 Cal.App.4th at p. 1087.)

> "In any custody determination, a primary consideration in determining the child's best interest is the goal of assuring stability and continuity. (*Burchard v. Garay* (1986) 42 Cal.3d 531, 538, and fn. 6.) 'When custody continues over a significant period, the child's need for continuity and stability assumes an increasingly important role. That need will often dictate the conclusion that maintenance of the current arrangement would be in the best interests of that child.' (*Ibid*., fn. omitted; see also *In re Marriage of McGinniss* (1992) 7 Cal.App.4th 473, 478.)" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)

"When making a custody determination in any dependency case, the court's focus and primary consideration must always be the best interests of the child.  [Citations.] Furthermore, the court is not restrained by 'any preferences or presumptions.' [Citations.]"  (*In re Nicholas H.* (2003) 112 Cal.App.4th 251, 268.)

Here, on June 10, 2014, after hearing argument by counsel for mother, the father, the children, and the department, the court stated as follows:

> "THE COURT:  All right.  As I understand it now that you, [mother's counsel]—since you have, I believe, the burden by a preponderance to show not only a change of circumstance, but also that it's in the best interest of—of the children, I'm a little—not a little concerned.  I'm very concerned that you have not, as to the best interest component, met the burden.
>
> "I understand … the children's interest is, of course, paramount in the Court's decision making at this point.  And I want to commend your client for doing what she has done.  It appears that she is doing well, but that is not—I don't think the burden that she needs to, you know, meet here.  I don't think there's been a demonstration that it is in the best interest to move the children from what appears to be a very stable and happy home."

Mother's counsel presented additional argument before the court made its ultimate determination:

> "First, Your Honor, I would just like to briefly address the challenges in regards to pursuing the best interest standard in regards to the mother.  Due to the fact that the children have been in their placements for a significant amount of time, absent mother, it's going to be—it's going to be a nearly impossible feat for her ever to show that it's actually in the best interest of the children to be placed with her, if she doesn't get additional time with—with the kids, and/or unless something happens in their current placement in regards to the health of the great grandmother.
>
> "Aside from that, she's just attempting to reestablish a relationship.  Obviously, it took a significant amount of time for her to get the case plan completed.  She's done that.  As previously stated, she's done that two times.  And she's done several things with great strides.
>
> "However, with the kids being in school and being involved in activities, it's just a mother's position that ultimately long-term, she is the best interest person to raise the children.  However, it's a significant barrier

5.

with her having limited access and time with the kids in their current placement.…  [¶] … [¶]

"THE COURT:  Okay.  Let me go ahead and take the matter under submission.  I think we've explored it.

"Mom, you are doing well.  And I understand the frustration where we kind of got a long ways down the road beyond reunification before you have made these strides.  And I'm not sure there may be still some concern with your grandmother, I guess.  So whether or not there's family members that can intercede, that might be able to mediate, whatever is a better situation for you.  I don't know.  I'll leave it at that.  I'll take the matter under submission.

"Court has reviewed and considered the—both the report of April 11, 2014[3] and the June 6, 2014 report.  Based thereon, I'll make the following findings:  [¶] … [¶]

"The 388 petition filed on March 13th, 2014 is denied for the reasons that I've previously stated on the record.  All prior orders not specifically set aside or modified by this Court order are to remain—to remain in full force and effect."

The court, as it previously indicated to mother's counsel, found mother did not meet her burden of showing termination of guardianship would be in the children's best interests.  The court expressly referenced two department reports it relied upon in making its determination.

The supplemental social study dated April 11, 2014, and filed June 10, 2014, reflects the department's finding that mother's housing arrangements were suitable,  yet it also notes the following:

"At this time, the mother has not provided any recent drug tests or any proof that she has maintained clean from drugs.  The mother did submit[]

_____

[3]Out of an abundance of caution, and as a result of the court's reference to "the report of April 11, 2014" as distinct from that of "June 6, 2014," this court asked the Kern Superior Court to consult its records to be certain the record on appeal was complete.  The supplemental record filed March 25, 2015, confirms that the social study dated April 11, 2014, was received by the juvenile court on that date and then subsequently filed on June 10, 2014.  The document was, in fact, a part of the record on appeal.  The social study dated June 6, 2014, was also filed on June 10, 2014.  Hence, the supplemental document filed with this court on March 25, 2015, did not serve to augment the record, nor did it necessitate additional input by the parties.

drug tests to the court filed with the 388 petition, however, the most recent test was dated May 13, 2013. The undersigned has made several attempts to contact the mother …. Phone call attempts were made on March 31, 2014, April 7, 2014, and April 11, 2014."

The department concluded in pertinent part:

"The mother … completed the required counseling as ordered by the court, however, the undersigned was unable to assess the mother's sobriety. The [legal guardian] continues to care for the children and has provided them with a stable home. [¶] Therefore, based on the circumstances, the [department] recommends that the modification petition … be denied and that the children remain with the legal guardian."

The supplemental social study dated June 6, 2014, and filed June 10, 2014, documents mother's negative result following random drug tests of April 14, 2014, and June 3, 2014. It also documents mother's mental health status and her frustration with the legal system as well as frustration in arranging visitation with her children through their guardian. Mother told the social worker she believed the trial court was "being '[r]acial toward her," and "that she would like a black Judge." Further, mother felt her children were being "brainwashed" by their guardian and she was very angry, hanging up on the social worker during a telephone conversation of June 6, 2014.

The social study noted the children's desire to remain with their great-grandmother as expressed in face-to-face meetings the children had with a social worker during an in-home visit. Additionally, it noted the legal guardian's position on the petition to terminate guardianship: she did not believe mother was ready to have the children returned to her care due to her mental instability. The children's guardian also feared that if the children were returned to mother's care, mother would use the money she received from the county to "buy drugs."

On this occasion, the department concluded that despite mother's completion of the required counseling and clean drug tests, the legal guardian continued to provide care and stability for the children and, thus, it was in their best interests to remain with their legal guardian.

The children's attorney argued persuasively, based upon the aforementioned reports and his own contact with his clients:

> "Thank you, Your Honor. I've had a chance to speak not only with the guardian … but also with all four of my clients not only recently, but when the last 388s were filed, and I believe there was a time before that.

> "I believe the information in the social worker's report is entirely accurate. I spoke individually with all four of my clients, and they all were consistent. They do not want to go live with their mother.

> "As Court is aware, not only does there have to be a showing of change of circumstance, but there has to be a showing of best interest. These kids don't want to go. These kids are happy, stable, well-adjusted kids.

> "[The legal guardian] is an amazing—amazingly sharp woman. She's a great grandmother. I think she's in her 60's, but she is just sharp as a tack. She has all of these kids enrolled in various activities. They're doing well in school. She's got them in Girl Scouts, church activities.

> "One of the things that was interesting when I read it is something that was mentioned to me by [the legal guardian], and it's mentioned in most recent report. That is the fact that because of some incidents that happened involving the mother coming to the house and making demands and causing disturbance, because of that grandmother had to shift her visits [to] a public place. And recently it's been the church, and those visits do seem to be going better.

> "But these kids have been in this home, actually for almost four years. They were placed there July 16th, 2010. They've been under a plan of guardianship since January 18th, 2011, three-and-a-half years longer. So they're in a home. They're stable.

> "It's unfortunate that [mother] still has some of the issues that she has. It looks like there's an indication that she's taking [S]eroquel to help control her thoughts. And she thought she was taking the medication for psychosis.

> "But these kids are happy and well-adjusted. They don't wish to go reside with their mother. [They] want to stay where they are and continue with the permanent plan of guardianship, which I believe is in their best interest."

Plainly, the court was focused on the best interest component rather than the changed circumstances component.[4] We do not agree with mother that the court engaged in an inappropriate household comparison.

In *In re Kimberly F.* (1997) 56 Cal.App.4th 519, the court, having rejected the juvenile court's comparison of the biological parent's household with that of the adoptive parents' as the test for determining the children's best interest, identified three factors, not meant to be exclusive, that juvenile courts should consider in assessing the issue of the child's best interest: (1) the seriousness of the problem that led to dependency and the reason the problem had not been resolved by the time of the final review; (2) the strength of the relative bonds between the child to both the child's parent and the child's caretakers and the length of time the child has been in the dependency system in relation to the parental bond; and (3) the degree to which the problem that led to the dependency may be easily removed or ameliorated, and the degree to which it actually has been. (*Id.* at pp. 530-532.)

The aforementioned factors focus primarily on the parent and fail to take into account our Supreme Court's emphasis on the child's best interest once reunification efforts have failed. (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 317.) "[A] primary consideration in determining the child's best interests is the goal of assuring stability and continuity." (*Ibid.*) "'When custody continues over a significant period, the child's need for continuity and stability assumes an increasingly important role.'" (*Ibid.*) Thus, the court considers the *Kimberly F.* factors only as they aid in determining how best to achieve continuity and stability.

---

[4]For that reason, we ignore the department's unsupported statement that mother did not establish changed circumstances. We note, too, that the department's brief was unhelpful because it merely recited legal authority and provided no legal analysis to support its conclusions. (*In re S.C.* (2006) 138 Cal.App.4th 396, 408-410 [every brief must cogently and precisely present argument supporting its assertions and provide meaningful legal analysis; otherwise, assertions may be deemed forfeited].)

9.

In this case, the court was rightly focused on the children's stability and expressly referenced that when pointing out mother's inability to meet her burden: "I don't think there's been a demonstration that it is in the best interest to move the children from what appears to be a very stable and happy home."

Mother makes much of the children's collective reference to the fact she does not have much money. Specifically, she asserts "[t]he evidence from the children can be summed up as they preferred to stay with their great-grandmother because she took them places and bought them things." We disagree with her summation.

While the children do in fact reference a financial disparity, a review of the record reveals there are other, much more significant reasons for the children to wish to remain with their great-grandmother. The three older girls, speaking separately with the social worker, expressed they feel safe with and cared for by their great-grandmother. They told the social worker they had no desire to live with their mother and that she "'yells'" often and "'acts crazy,'" was "'on drugs,'" and physically fought with her family members. The oldest stated her mother once gave her sister "'a black eye.'" A review of letters written by the girls reveals the following statements:

> "I do not want to go [with] her (mother). She going to be mean to us and she going to thrash us badly and she going to send us back to foster home. … She siad [*sic*] she going to kill us."

> "I don't want to live with my mom because she would harm us like hit us and everything.…"

> "I do not want to live with my mom she is scary. I have night mares I want to live with my nice grandma."

> "I want to live with my grandma because she take good care of me and my mom don't and another thing why I don't want to live with my mom she's drunk and crazy."[5]

---

[5]The record also reveals the two oldest children told a social worker in 2012 that they wished to stay with their great-grandmother because "they all feel safe in the home and they would not be safe if they were to return to their mother's care" as they are "all afraid of getting hurt."

As we interpret the record, the children's references to the fact their great-grandmother is able to purchase them items and take them places are but one part of their attempts to explain why they feel cared for and safe as compared to the way they felt while living with their mother.

Notably, too, the record contains evidence that while a random drug screen taken June 3, 2014, proved negative, mother continued to exhibit anger—something her children feared. Mother "became very angry" after expressing the belief that her children were being "brainwashed" by their guardian to say they are afraid of her and do not want to live with her. When the social worker suggested mother undergo a psychological evaluation, mother "stated that everyone working on her case need[ed] a psychological evaluation," before ending "the call abruptly stating that she would just see the [social worker] in court." A review of the record as a whole evidences instance after instance of mother's inability to control her anger. This would certainly bear on the children's best interests and their stated fears.

In sum, the trial court's determination is not arbitrary or capricious, nor is it patently absurd. It fairly acknowledges the strides mother has made, but rightly finds the children's best interests would not be served by removal from the permanent and stable placement they enjoy in their great-grandmother's home.

**DISPOSITION**

The judgment is affirmed.

_____
PEÑA, J.

WE CONCUR:


_____
CORNELL, Acting P.J.


_____
GOMES, J.

11.