Filed 7/8/24  In re I.R. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re I.R., a Person Coming Under the Juvenile Court Law. | B329912 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 22CCJP02688A) |
| Plaintiff and Respondent, | |
| v. | |
| F.L., | |
| Defendant and Appellant. | |

APPEAL from order of the Superior Court of the County of Los Angeles, Jean M. Nelson, Judge.  Affirmed.

Lauren K. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Sarah Vesecky, Senior Deputy County Counsel, for Plaintiff and Respondent.

_____

I.R. (born 2019) was the subject of a dependency petition filed by the Los Angeles County Department of Children and Family Services (DCFS) under Welfare and Institutions Code section 300.[1]  I.R. was not removed from his parents, F.L. (mother) and A.R. (father), and they shared joint physical and legal custody during the proceedings.  The juvenile court terminated its jurisdiction and issued an exit order pursuant to section 362.4 that awarded sole legal and physical custody of I.R. to father. [2]  Mother appeals from the exit order and challenges the juvenile court's custody award.  We conclude the juvenile court did not abuse its discretion and affirm.

## BACKGROUND

### A.    Prior Referrals

I.R. first came to DCFS's attention in 2020.  An initial referral alleged father had thrown objects at mother and I.R., and mother had expressed thoughts of suicide.  Later that year, mother's therapist initiated another referral, alleging mother and father argued and yelled at one another with I.R. lying between

_____

[1]    All statutory references in this opinion are to the Welfare and Institutions Code unless otherwise specified.

[2]    The Custody Order—Juvenile—Final Judgment filed in the juvenile court on June 9, 2023 was not included in the record.  However, DCFS moved to augment the record to include this document, and we grant DCFS's motion.

2

them.  DCFS investigated the referrals but did not initiate dependency proceedings.

Conflicts between mother and father continued.  Law enforcement service logs for 2021 and 2022 reveal responses to multiple calls alleging that father battered and threatened mother, and mother broke into father's home, destroyed property, and refused to leave.  In November 2021, father was detained for, but not charged with, intimate partner battery.

## B.    Operative Referral

In early June 2022, mother initiated a third referral.  She alleged that, during an argument six months earlier, father slapped her and grabbed her wrist and twisted it, and she kicked him.  She alleged father had a drinking problem and was likely using drugs, hit her, threatened to kill her, took her phone and keys, and kicked her out of the home.  Mother alleged her relationship with father ended in November 2021, and she had left I.R. in father's care because she was homeless.  Mother alleged she had not seen I.R. in person since February 2022.  She contended she did not go to father's home because he had gang affiliations and lived with gang members.  Notwithstanding these allegations, mother said she had no concerns with father's caring for I.R. because he was a "good father" who would "not do anything to harm" I.R.

A social worker reached out to parents and other family members.  Mother disclosed she had been diagnosed with post-traumatic stress disorder and depression, and her mental health conditions had been serious enough to necessitate treatment at a residential care facility for several years.  She had been prescribed medications but had stopped taking them at least a

year earlier. Mother admitted she attempted suicide in September 2021, allegedly because father stopped her from going to therapy and because she was unable to cope with violence in the relationship.

Mother alleged father scheduled a time for her to visit I.R. and then attempted to have sex with her. She alleged father had given his current girlfriend a black eye, which made mother concerned for I.R.'s safety.

Father alleged mother was homeless and was not complying with her mental health treatment. He alleged mother used drugs and had visited his home multiple times, attempting to provoke him into a physical altercation. Mother's instability made father concerned for I.R.'s safety.

I.R.'s 10-year-old half-brother (brother), who lived with father and I.R., denied feeling unsafe there and denied father verbally abused or physically disciplined him. Brother reported mother "likes to argue with his father" and came to their home unannounced, circumstances he described as "'scary.'" Maternal grandparents described both parents as unstable and unable to agree on what is best for I.R.

## C. Section 300 Petition and Detention

On July 12, 2022, DCFS filed a petition on behalf of I.R. pursuant to section 300, subdivisions (a) and (b). According to the petition's allegations, parents had a history of engaging in violent conduct in front of I.R. that placed the child at risk of serious physical harm, damage, and danger. Further, mother was alleged to have a history of substance abuse, current marijuana use, mental and emotional problems, and a history of self-harming behavior that rendered her incapable of providing

4

regular care for I.R.  The petition alleged father knew of these problems and failed to protect I.R.

In July 2022, father obtained a temporary restraining order against mother on behalf of himself, I.R., and brother based on allegations that mother threatened him with a knife and choked him.  The order expired on July 25, 2022.  In DCFS's detention report, the social worker noted parents' difficulty communicating with one another regarding custody and visitation, and father had sought law enforcement intervention to address mother's "unpredictable" behavior.

At the detention hearing on July 26, 2022, the juvenile court found a prima facie case existed, and I.R. was a person described by section 300.  The court, adopting DCFS's recommendation, released I.R. to both parents.  Mother was ordered to complete a mental health assessment.  Parents were ordered to communicate through the Talking Parents application and enlist the aid of a third party when they exchanged I.R.  The juvenile court issued a stay-away order, forbidding parents from coming within 100 yards of each other's residences and from contacting each other electronically and by phone.

In conversations with the social worker, parents added to their allegations of the other's wrongdoing.  According to father, mother broke the security system in his home, hired someone to kill him, and engaged in self-harming behavior.  According to mother, father raped her during the relationship, and the prior day, I.R. complained that father hit him in the back with a closed fist.  Mother said she felt abused when parents communicated over the Talking Parents application.

The clinician who conducted mother's mental health assessment opined that mother's parental capacity was limited

5

due to her limited knowledge of parenting skills and understanding of how coparenting conflict affects minors in the household.

## D. Jurisdictional and Disposition Hearing

A combined jurisdictional and dispositional hearing was held in October 2022. The count alleging a risk of harm arising from parents' history of violent conduct was amended to remove the allegations of violent conduct by mother and was sustained as amended. The count alleging parents' failure to protect was sustained as pleaded. The count alleging mother's substance abuse was voluntarily dismissed. The count alleging mother's mental and emotional problems and father's failure to protect was sustained as pleaded. The juvenile court found I.R. a person described by section 300, subdivisions (a) and (b), incorporated its jurisdiction findings, and declared I.R. a dependent of the court.

At the hearing, I.R.'s counsel reported that coparenting was a "big issue." "[E]ach time they have the child, the parent complains of the other parent causing some sort of harm to the child, and it is kind of a constant 'he did this/she did this,'" and the social worker was "getting inundated with a lot of phone calls and emails." The juvenile court found no clear and convincing evidence to remove I.R. from either parent, and it ordered joint physical custody to stay in place as long as they cooperated with DCFS and participated in services.

The juvenile court's order included mental health counseling and a directive that mother take all prescribed psychotropic medications, as well as a referral of parents to counseling to address domestic violence, alcohol abuse, coping strategies, coparenting, cycle of violence, child protection,

personal trauma, and father's pattern of controlling and intimidating his partners.

The juvenile court warned parents that, at the upcoming review hearing, it would "be looking for [their] ability to co-parent." The court prohibited parents from making derogatory comments and false claims about one another and from using I.R. as a reason to get the other parent in trouble.

## E. Father's Request for Order Admonishing Mother to Stop False Reports

On January 19, 2023, father filed a request for an order, alleging mother had made multiple false reports to law enforcement accusing father of kidnapping or abusing I.R. He asked the court to admonish mother to stop making false reports to the police and DCFS. A hearing, attended by both parents, was held the following week.

On approximately five occasions, DCFS's counsel told the juvenile court, mother reported to law enforcement that father had kidnapped son, and as a result of the reports, father had been forcefully detained. Mother's counsel did not deny these allegations. Instead, her counsel explained, parents had custody of I.R. on alternating weeks, and exchanges of I.R. were made at a police station. Mother's counsel admitted mother sometimes failed to call father to confirm an exchange 24 hours in advance, as parents were required to do, and when father did not bring I.R. to the exchange location, mother reported to law enforcement that son had not been returned to her. Mother's reason for involving the police instead of the social worker, her counsel said, was because mother had "some difficulty getting a hold" of the social worker.

According to DCFS's counsel, the social worker had warned mother that parents' visitation agreement required her to confirm each exchange in advance, but mother responded she didn't feel the need to do so. Further, DCFS's counsel reported, mother sometimes sent her boyfriend, a non-approved person, to pick up I.R., and mother had gone to father's home before an exchange in violation of the stay-away order. DCFS was concerned the kidnapping reports endangered I.R., and it supported father's request for an admonishment. Father's counsel concurred with DCFS's description of the events and added, "[I]t is really dangerous and has gotten to the point where the police believe there is active crime and come with guns out and arrests [*sic*] the father."

The juvenile court found the evidence "compelling," and stated, mother "need[ed] to change her conduct." The court observed, it is "harmful for . . . children to be involved in law enforcement actions where law enforcement comes in and doesn't know the level of danger and may suddenly think there is something worse going on. And we all know that gun violence can break out when people don't understand what is going on." The court stated, "If father is not giving over the child, the mother is to call the social worker. If mother sees bruises or marks or has concerns about something that is happening to the child while in father's care, she is to call the social worker. And it is an extreme measure to call law enforcement[,] and it is a waste of law enforcement resources if there is not truly an emergency."

The court ordered "mother to contact the social worker regarding abuse or kidnapping allegations." The juvenile court warned mother that her failure to follow the order would result in

8

a change of the custody order because "she is putting the children at risk . . . ."

## F.      Section 364 Hearing

In the spring of 2023, DCFS recommended termination of the juvenile court's jurisdiction.  DCFS recommended the grant of sole legal and physical custody of I.R. to father based primarily on its concerns about the false kidnapping reports to law enforcement.

At the May 2023 section 364 hearing, the juvenile court agreed with DCFS's recommendations.  The court observed that "conflict between parents can continue to put a child at risk," and it was in I.R.'s best interest to give father sole legal and physical custody to "decrease this conflict that is oftentimes instigated by mother."  The court found mother had not significantly changed her conduct since the hearing concerning her false police reports.  The court found mother recently made more false allegations, contributed to the conflicts to a greater degree than father did, and failed to follow through on her commitment to take I.R. for a dental examination.  The juvenile court entered a custody order and final judgment terminating its jurisdiction and granting sole legal and physical custody of I.R. to father, with mother to have unmonitored visits.

Mother timely appealed.  She contends that the juvenile court abused its discretion in awarding sole legal and physical custody of I.R. to father.

# DISCUSSION

## A.    Governing Law

"Section 362.4 governs the termination of juvenile court jurisdiction and related orders." (*In re J.M.* (2023) 89 Cal.App.5th 95, 112 (*J.M.*).)  "The statute authorizes a juvenile court to make 'exit orders' regarding custody and visitation upon terminating dependency jurisdiction over a child." (*Ibid.*; *In re Chantal S.* (1996) 13 Cal.4th 196, 202—203.)  "These exit orders remain in effect until modified or terminated by a subsequent order of the superior court." (*J.M.*, *supra*, 89 Cal.App.5th at p. 112, citing § 362.4, subd. (b); see also Cal. Rules of Court, rule 5.700.)

"[I]n making exit orders, the juvenile court must look at the best interests of the child." (*J.M.*, *supra*, 89 Cal.App.5th at p. 112, quoting *In re John W.* (1996) 41 Cal.App.4th 961, 973.) "Because juvenile dependency proceedings arise when children are subject to or at risk of abuse or neglect, '[t]he presumption of parental fitness that underlies custody law in the family court just does not apply. . . .  Rather the juvenile court, which has been intimately involved in the protection of the child, is best situated to make custody determinations based on the best interests of the child without any preferences or presumptions.' [Citation.]" (*Id.* at p. 112.)  "A finding that neither parent poses any danger to the child does not mean that both are equally entitled to half custody, since joint physical custody may not be in the child's best interests for a variety of reasons." (*In re Nicholas H.* (2003) 112 Cal.App.4th 251, 268 (*Nicholas H.*).)  "By the same token, a finding that the parent from whom custody was removed no longer poses a risk of detriment or that the parent whose custody has been subject to supervision no longer requires

10

supervision is relevant to, but not necessarily determinative of, the best interests of the child." (*Ibid*.)

The juvenile court has broad discretion to make custody orders when it terminates jurisdiction. (*J.M., supra*, 89 Cal.App.5th at p. 112.) We review the juvenile court's exit orders for an abuse of that discretion. (*Id*. at p. 113.) The juvenile court's decision will not be disturbed unless it has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination. (*Ibid*.) We "'consider all the evidence, draw all reasonable inferences, and resolve all evidentiary conflicts, in a light most favorable to the trial court's ruling. [Citation.] The precise test is whether any rational trier of fact could conclude that the trial court order advanced the best interests of the child. [Citation.] We are required to uphold the ruling if it is correct on any basis, regardless of whether it is the ground relied upon by the trial judge. [Citation.]'" (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067.)

## B. The Juvenile Court did not Abuse its Discretion in Awarding Sole Legal and Physical Custody to Father

Mother argues that awarding sole legal and physical custody to father was an abuse of the juvenile court's discretion because the evidence suggested I.R. "thrived" in the care of both parents, and there was no evidence I.R. was unsafe in her care. She contends the award was speculative and unfair because the court relied on evidence that she made false kidnapping reports to police and false reports to the social worker, without adequately weighing the interests of continuity and stability in determining I.R.'s best interests. We disagree.

11

Because the custody order was made in a dependency proceeding, it was not presumed mother was entitled to half custody because of her parental fitness (*J.M., supra*, 89 Cal.App.5th at p. 112), and I.R.'s safety in her care was not dispositive of his best interests. (*Nicholas H., supra,* 112 Cal.App.4th at p. 268.) Instead, the juvenile court based the custody order on evidence indicating shared custody was unworkable due to serious parental conflicts that were often instigated by mother.

Courts have long recognized that conflict can make it impossible or impracticable for parents to effectively coparent, and in such circumstances, a child's best interests are served by an award of sole custody. (See, e.g., *In re Marriage of Battenburg* (1994) 28 Cal.App.4th 1338, 1344 ["The parents' attitudes and actions towards each other indicated that the joint custody arrangement was not working," resulting in grant of sole physical custody to mother]; see *J.M.*, *supra*, 89 Cal.App.5th at p. 108 [affirming exit order awarding sole physical custody to mother where father was noncompliant and "coparenting between mother and father was an 'ongoing issue.'"].)

Here, the juvenile court acknowledged parents' difficulty in coparenting early in the case. After reviewing the detention report, the court directed them to cease making negative comments about one another reasoning, "That is not helping your kid when you do that." It also issued a stay-away order in an attempt to reduce conflicts. At the jurisdiction and disposition hearing, the court warned parents that it would be "be looking for [their] ability to co-parent" at the section 364 review hearing. To this end, the court forbade parents from texting, calling, and disparaging each other. The court stated: "[Y]ou are not to use

[I.R.] as a tool, as a reason to get the other parent in trouble. You will permanently, emotionally damage your child." The court stated, "Don't make false claims about what the other parent has done."

The parental conflicts persisted, especially in connection with the exchange of I.R. Evidence in the record shows that mother failed to comply with parents' agreement to confirm exchanges of I.R. in advance, and she sometimes sent an unapproved person in her place. Then, when father did not complete the exchange, she reported a kidnapping. Mother did not express remorse for endangering or causing distress to father and I.R.,[3] and instead, her counsel offered only mother's desire to "feel a little more empowerment over her family and her life," which caused her to make "some decisions that she now knows were not ideal." The juvenile court was not required to overlook mother's stated motive for making the reports, her seeming lack of appreciation of the risk of harm she created,[4] and her lack of contrition.

Moreover, evidence in the record supported the juvenile court's finding that mother had not significantly changed her

---

[3] Accusing an innocent person of "felonious conduct and calling in the police could foreseeably lead to a police investigation, escalation of the conflict, and arrest, all of which would cause emotional distress." (*Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1064.)

[4] In this appeal, mother still denies she created a dangerous situation by falsely reporting kidnappings in progress, arguing the juvenile court's concern about gun violence was "complete speculation." However, in the proceedings below, mother did not deny father's counsel's report that the situation had "gotten to the point where the police believe there is an active crime and come with guns out and arrests [*sic*] the father."

13

conduct, as she continued to try to "get Dad in trouble" by using different tactics. The social worker warned mother that her making false allegations "continues to create conflict[s] with co-parenting." Nevertheless, during the month before the section 364 review hearing, mother reported to the social worker that the then-three-year-old I.R. told her father "'lost his house'" and said it was mother's fault. The social worker found, however, father was still residing at his address with no plans to move. The same month, mother reported to the social worker that father sent her a threatening message. She was unable to substantiate her accusation, however, because her proof was a screenshot of a message showing no indication that father was the sender or mother was the recipient.

This evidence supported the juvenile court's finding that the parental conflict was "oftentimes . . . instigated by mother," and, while both parents tried to manipulate the other and get the other in trouble, mother did it "to a worse degree than father" and did not want to accept that her conduct would affect I.R. Similarly, the court acknowledged, although father could be "difficult," he had not endangered mother and son by calling law enforcement. The juvenile court was within its discretion to determine that mother had not acted in I.R.'s best interest while parents attempted to share custody. (See *In re John W.*, *supra*, 41 Cal.App.4th at p. 974 ["A child's best interests are not necessarily served by shuttling between two parents . . . ."].)

Mother does not address the juvenile court's other concern with shared custody: joint legal custody would not serve I.R.'s healthcare needs. Evidence in the record indicates that mother promised the social worker she would schedule a dental examination for I.R., but after two months, still had not done so.

14

Father, when asked to make the appointment, immediately complied and reported a few weeks later that son had been seen by the dentist. The juvenile court reasonably could conclude that I.R.'s dental and medical needs would be best served by father's having sole custody.

Finally, mother argues, removing her custody was an abuse of discretion because the juvenile court failed to adequately weigh stability and continuity in determining I.R.'s best interests as required by *Burchard v. Garay* (1986) 42 Cal.3d 531, 538 (*Burchard*). We disagree.

In *Burchard*, our high court reversed the appellate court's affirmance of a family court's order awarding sole custody of son to his father. Custody determinations, our high court held, required an assessment of the emotional bonds between parent and child, i.e., "the ethical, emotional, and intellectual guidance the parent gives to the child throughout his formative years, and often beyond," as well as a "factual determination of how best to provide continuity of attention, nurturing, and care." (*Burchard*, 42 Cal.3d at p. 540.)

Our high court concluded that the family court abused its discretion by basing its custody award on father's superior financial circumstances and supposedly superior childcare arrangement: he could provide in-home care by a stepmother, whereas mother would need to rely on childcare services while she worked. These reasons were "insignificant" compared to the fact that mother had been the primary caretaker from son's birth to the trial hearing, no serious deficiency in her care was proved, and under her care, son had become a happy, healthy, well-adjusted child. (*Burchard, supra,* 42 Cal.3d at p. 541.) Our high court stressed "the importance of stability and continuity in the

life of a child, and the harm that may result from disruption of established patterns of care and emotional bonds," and it concluded that father's showing was "wholly insufficient to justify taking the custody of a child from the mother who has raised him from birth, successfully coping with the many difficulties encountered by single working mothers." (*Ibid*.)

The facts are very different in this juvenile court case. (*J.M., supra*, 89 Cal.App.5th at p. 112.) As discussed *supra*, evidence in the record showed that father parented I.R. alone for 11 months (approximately one-third of I.R.'s life) while mother was homeless, the social worker reported no issues with father's care or home, maternal grandmother described I.R. as "a happy child," and mother "ha[d] no concerns regarding the child's safety" while I.R. was in father's care during that period of his life. Ample evidence established that when mother and father had shared custody, the arrangement was riddled with conflict that interfered with coparenting. Thus, the record provides evidence to show an award of sole legal and physical custody to father, with unmonitored visits by mother, was a solution that provided "continuity of attention, nurturing, and care" for I.R. (*Burchard, supra,* 42 Cal.3d. at p. 540.) It was not arbitrary, capricious, or patently absurd.

In sum, from the totality of the circumstances, a rational trier of fact could conclude that awarding sole legal and physical custody to father advanced the best interests of I.R. (*In re Robert L., supra,* 21 Cal.App.4th at p. 1067.) Accordingly, we conclude

the juvenile court did not abuse its discretion in making the order.[5]

## DISPOSITION

The juvenile court's order is affirmed.

MORI, J.

We concur:

COLLINS, Acting P.J.

ZUKIN, J.

---

[5] Mother argues for the first time on reply that DCFS did not seek removal of I.R. from her custody by filing a section 387 petition. Mother has waived this argument, as she has not explained her failure to raise it in her opening brief, and further, because she has not supported the point with reasoned argument or citation to authority. (*Ross v. Seyfarth Shaw LLP* (2023) 96 Cal.App.5th 722, 736 [deeming waived arguments raised for the first time on reply, where appellant made no attempt to show good cause why argument should be considered]; *Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 277 [point waived when an appellant failed to support a point with reasoned argument or authority].) In any event, section 387 describes petitions to remove children to a foster home or institution, and mother has not explained how this section applies to an award of custody to *another parent.* (§ 387, subd. (a) ["An order changing or modifying a previous order by removing a child from the physical custody of a parent . . . *and directing placement in a foster home, or commitment to a private or county institution,* shall be made only after noticed hearing upon a supplemental petition." (Italics added.)

17